## ROBERT JACKSON *v.* THE STATE.

1. CRIMINAL LAW. *Evidence. Admissibility of evidence of communicated threats in trials for homicide. Appearances and imminence of danger. Overt act.* The general rule, subject perhaps to exceptions in extreme cases, is, that in trials of indictments for homicide, evidence of previous threats made by the deceased against the prisoner, and communicated to him before the killing is admissible, without reference to the question whether there is any evidence tending to show that at the time of the killing the deceased was doing some overt act manifesting a present intention to carry such threats into execution; or, without reference to the question whether there was proof tending to show that the defendant may have acted upon a reasonable belief that he was in danger of death or great bodily harm at the hands of the deceased.

2. SAME. *Evidence of communicated threats.* Ordinarily, the judge cannot assume whether there is evidence tending to prove such a state of facts as would make testimony of such communicated threats relevant, because this would be to decide on the effect of the evidence upon a material question in the case—a matter which belongs exclusively to the jury.

3. SAME. *Overt act. Jury must determine in each case.* What constitutes such an overt act as will warrant a person in slaying his enemy in his own defense, is a question for a jury, to be solved according to the circumstances of each particular case. No general rule can be laid down upon the subject.

4. SAME. *Previous threats will not justify killing.* Previous threats or acts of hostility, however violent they may be, will not justify a person in seeking and slaying his adversary.

Cases cited: Rippy *v.* State, 2 Head, 217; John C. Williams *v.* State, 3 Heis., 376; Harman *v.* State, 3 Head, 243; Wright *v.* State, 9 Yerg., 342; Copeland *v.* State, 7 Hum., 479.

Authorities cited: Pridgen *v.* State, Horrigan & Thompson, 416; Little *v.* State, Post., 487; Contra, Myers *v.* State, *Ibid*, 432; Hays *v.* State, *Ibid*, 492; Cotton *v.* State, *Ibid*, 310; Harris *v.* State, *Ibid*, 276; Rippy

v. State, *Ibid*, 345; Williams v. State, *Ibid*, 349; Lander v. State, *Ibid*, 396; Carrico v. State, *Ibid*, 389. See Horrigan & Thompson's Cases on Self-defence.

## FROM LAUDERDALE.

Appeal from the Circuit Court.

L. B. HORRIGAN for Jackson.

ATTORNEY-GENERAL HEISKELL for the State.

McFARLAND, J., delivered the opinion of the court.

The prisoner was indicted for the murder of Martin Demoss in Lauderdale county, and was tried and convicted of murder in the second degree. His motion for a new trial and in arrest of judgment were overruled and judgment rendered, from which the prisoner has appealed to this court.

The bill of exceptions shows that the State examined three witnesses, two of whom were immediately present and witnessed the homicide; the other was sixty or seventy yards distant.

The following is a brief statement of the facts deposed to by these witnesses: The prisoner, in company with Lacy (one of the witnesses), was on his way home from the "cross-roads," late in the evening of Wednesday, the 15th of November, 1871. They entered a lane running north and south which intersected with another running at right angles. The deceased, with his brother (one of the other witnesses), was in

this latter lane going out to pick cotton; each party were moving toward the junction of these roads, and at, or about that point, they met. The prisoner was carrying a shot-gun, and when he discovered the deceased at a distance of forty or fifty yards, he took the gun off his shoulder and cocked it, and put it under his arm. When they met, each party bore to the right-hand side of the road—nothing was said. When the parties were about opposite each other, the prisoner suddenly turned his gun, and without raising it to his shoulder, fired, striking the deceased with ten or more buckshot in the left side, between the ribs and hip-bone, and a little to the front. The deceased was also shot through the back of the right hand with three shots, showing that, at the moment, the deceased had his right hand upon his left side— of these wounds he soon after died. The only other material fact stated by the other witness, who was further off, was that when the deceased and his brother passed him on the road, they were conversing in an ordinary manner, with no mark of excitement. This was the substance of the proof upon which the State rested the case.

The prisoner introduced a number of witnesses by whom he proposed to prove the following facts in substance: That the deceased had previously manifested very bitter and hostile feelings towards the defendant, and on Wednesday before the homicide had attacked him in a public road, and compelled him to seek safety in flight, and it was with difficulty the deceased was induced to desist by the interference of the by-

standers. The defendant had armed himself with an
ax, after fleeing a short distance, and stood upon the
defensive; the deceased armed himself with a billet
of wood, and manifested a determined purpose to press.
the contest, but finally left, saying he would see de-
fendant and have satisfaction at another time. That
on the same day he told a witness that he had just
had a difficulty with the defendant that morning; that.
he had sold his crop to Mr. Wakefield, and as soon
as he got his pay, which would be in a few days,
he was going to kill Jackson (the defendant), and go
to Arkansas; that he and Jackson both could not
live. This conversation was repeated to the defendant
the next day by the witness. The same threat in
substance was made to another witness on the same
day, and also repeated to the defendant on the next
day. On the day before the homicide the deceased
said to another witness, after a good deal of boasting
in regard to his difficulty with the defendant, that he
would have satisfaction out of Jackson before he left
the country. This was communicated to the defend-
ant the morning of the homicide. The defendant pro-
posed to prove that the deceased had insulted and
assaulted him on another occasion previous to the
affair on Monday first spoken of. It was proposed
to be proved by a number of witnesses that the de-
ceased was one of the most turbulent, reckless, relent-
less, revengeful, dangerous characters ever known to
the witnesses—a man of herculean physical power, and
a terror to the whole neighborhood; that the defend-
ant was informed by other witnesses of other threats;

Jackson v. The State.

was a feeble, man, afflicted with rheumatism, and was advised to go armed to defend himself.

The judge sent the jury from the room when the testimony was offered; heard from the witnesses the testimony proposed as above, and held it all inadmissible. Except the court held that the defendant might prove the existence of unfriendly feeling between him and the deceased, but nothing more, it is manifest that the effect of this taken alone would be more against the prisoner than in his favor. This raises the question for our determination. In the first place we think the practice adopted by the judge in sending the jury from the room while the question as to admissibility of the testimony was being discussed not only not objectionable, but highly commendable. If the testimony was incompetent, it was certainly not error to refuse to allow the jury to hear the defendant propose to make the proof. The question, however, is, was this testimony, or any part of it, admissible. The reasoning upon which the judge acted, and the argument made here with much earnestness in support of his ruling, may be stated as about this: That no previous threats, or acts of hostility, however so violent, will justify the party in slaying his adversary. To excuse a homicide the danger of life or great bodily harm must be real, or honestly believed to be so, and must be imminent and apparent at the time. That there must be some overt act at the time indicating a present purpose upon the part of the deceased to take the life of the defendant or do him some great bodily harm. That it is only when the

proof shows some such overt act at the time of the homicide that previous threats, previous difficulties, and the character of the deceased, may be introduced and considered in connection with such overt act to enable the jury to determine whether the defendant acted under the honest and well founded belief that he was at the moment in imminent peril of his life. That it is the province of the court to say when there is evidence, and as the judge was of opinion that there was no evidence of any such overt act upon the part of the deceased at the time of the homicide, it resulted that it was within his province to exclude the evidence offered of previous threats, etc., from the jury, as it could not be available as a defense.

We fully assent to the first proposition maintained by the Attorney General, that is, previous threats or acts of hostility against the defendant, however violent they may be, will not of themselves justify him in seeking and slaying his adversary upon the assumption that it is necessary to do so in order to save his own life from the threatened danger. To excuse the slayer he must act under an honest belief that it is necessary at the time to take the life of his adversary in order to save his own, and it must appear that there was reasonable cause to excite this apprehension: See *Rippy* v. *The State*, 2 Head., 217; *Williams* v. *The State*, 3 Heis., 376. There are authorities holding a somewhat different doctrine, but we cannot yield to them. (Kentucky cases.)

But the question here is, what evidence may be heard by the jury in order to enable them to deter-

mine whether or not the defendant is excusable under the principle above stated. We concede, as we have already said, that to make out this defense that defendant must act under an honest and well founded apprehension that it is necessary at the time to take the life of his adversary in order to save his own. But surely, in showing the grounds of this apprehension, he should not be confined to evidence of what occurred at the moment of the homicide. It is said there must have been an overt act of the deceased at the time showing his deadly purpose; but what is an overt act, and who is to judge whether or not there was such overt act? If the parties, previous to the fatal meeting, had been friends, with no hostile feeling, the deceased a person of mild temper, certainly an overt act upon the part of deceased that would justify the defendant in taking his life upon the assumption that it was necessary to do so in order to save his own, ought to be some demonstration of a very decided character indicating a deadly or dangerous purpose. On the other hand, if the parties were deadly enemies, and the deceased had previously made attempts or threats against the life of defendant, and was known to be a person of violent and dangerous character, likely to execute his threats, then in such case, upon the parties meeting, the defendant would not necessarily be bound to wait until his adversary had actually drawn a deadly weapon or was in the very act of striking. The necessary overt act in the one case might be different from the other. It is difficult to lay down a rule strictly governing all cases,

Jackson *v.* The State.

the circumstances of the cases differ so widely. The overt act that will justify a defendant in assuming that his own life is then in danger, must depend upon the circumstances of each particular case. Cases may be readily supposed, and no doubt in reality often occur, when to require a defendant to wait until his adversary actually begins the combat would be to require him to wait until there would be but little chance left of successful defense. Cases where the deadly purpose of the party is so fixed and determined, his character so reckless and bloody, his use of deadly weapons so expert and skillful, that to await his attack would be to await almost certain death, and the result of the encounter would often depend upon which party was the quicker in action. In cases of this character where the parties meet, a very slight movement might justify either party in acting at once, upon the assumption that his life is then in instant peril; or cases might occur where the fact that the deceased met the defendant under the particular circumstances and in connection with previous facts, might show that the deceased sought the meeting with a deadly purpose, and be itself an overt act. These are doubtless extreme cases; but they are used to show that the "overt act" spoken of is a question depending upon the entire circumstances of each particular case, and also to illustrate the meaning of the expression that "the danger must be imminent at the moment." These expressions must be understood in their proper, sense and as applied to the facts of each case, and to show that the defendant's fear was honest

and in good faith, it should appear that the circumstances were such as would naturally create this apprehension in his mind; not that he was in actual danger—one party might assail another with a gun or pistol in such manner as to create an honest belief in the mind of the latter that his own life was in instant peril, and yet it might in reality afterwards appear that the gun or pistol was not loaded, and the attack was really feigned; but if this was not known to the party assailed, and the circumstances were such as were reasonably calculated to deceive him, his defense would certainly be as complete as if the danger had been real, and in this sense must be understood the remark that there must be reasonable ground for the defendant's action. Now it is very apparent that in all cases where previous acts of hostility and threats upon the part of the deceased, in connection with his character and the facts immediately attending the homicide, may establish the fact that the defendant, in taking his life, acted under the belief that his own life was in peril—the testimony should be heard, otherwise the true attitude of the parties, and the grounds upon which the defendant acted, and his state of mind, would not appear.

But the argument of the Attorney General is that this testimony should only be heard when the facts attending the homicide show that it might justify the defendant's conduct; that it is the duty of the judge to say whether, in the facts attending the homicide, there is any evidence showing an overt act of the deceased at the time, if not, the testimony should be

excluded, as in this case. ' The cases put by the Attorney General by way of illustration are extreme, as, if it should appear that the deceased, at the time he received the fatal blow, was asleep, so he could not have committed an overt act.

It would seem very clear that no amount of previous threats would justify a jury in such a case in acquitting a defendant upon the ground that he then acted under fear of his life, but whether, in such a case, the judge should exclude the evidence altogether we do not decide. Such, at any rate, is not the present case. The rule that it is the province of the judge to decide if there is any evidence is, no doubt, a correct one when properly applied; but here, for the judge to decide that there was no evidence of an overt act or hostile demonstration upon the part of the defendant at the time of the homicide sufficient to admit proof of previous threats, was necessarily to decide the very question upon which the case turned, and which was the peculiar province of the jury. The evidence of the facts attending the homicide was before the jury. What was the effect of this evidence, what results were established by it? were questions for the jury, and the judge was not authorized to decide that in the facts deposed to by the witnesses there was no evidence of passion, excited by adequate provocation, to reduce the offense to manslaughter. However clear these propositions may have appeared to the judge, they are nevertheless questions for the jury. While the judge was in form deciding that there was no evidence of the given proposition, he was in effect

deciding upon the weight and effect of the evidence upon a point vital to the case.

We are not aware that this direct question has been before this court. The case of *Harman* v. *The State*, 3 Head, 243, relied upon by the Attorney General, was a conviction for an assault and battery. The evidence rejected in that case was offered to show the bad, and dangerous, and desperate character of the prosecutor, of his numerous assaults upon other parties. It was held that the evidence was properly rejected. Judge Wright said: "In an indictment for an assault and battery the character of the prosecutor can, as we apprehend, never be made a matter of controversy, except when involved in the *res gestae*, since the fact that he may be an overbearing, tyranical, and dangerous man, in the habit of assaulting others, furnishes no legal excuse to the defendant to assault him. The defendant may prove that he was acting in self-defense, or he may exhibit whatever provocations were given to him by the prosecutor, but he cannot set up general reputation, or the conduct of the prosecutor towards others as a defense. When, however, it is shown that the defendant was under reasonable fear of his life, or great bodily harm from the prosecutor, the prosecutor's temper, in connection with previous threats, etc., is sufficiently part of the *res gestae*, to go in evidence as explanatory of the state of defense in which the defendant placed himself," citing Wharton Cr. L., 234–5; 3 Iredell, 424; *Wright* v. *The State*, 9 Yerg., 342; and he adds, "that the proof of the prosecutor's bad temper would have been relevant and admissible

in that case, but the defendant's proposition was made too broad, and was, therefore, at fault."

In the case of *Williams* v. *The State*, 3 Heis., Judge Nicholson, in reviewing the facts, held that the conviction of murder in the second degree was well-sustained by the evidence, upon the ground that it did not appear that at the time of the homicide the deceased was making any demonstration against the defendant, or that the defendant acted under apprehension of danger to himself, and yet the evidence of previous hostile demonstrations and threats by the deceased were considered relevant, and their effect discussed.

It is true, no objection appears to have been made to the testimony in that case. This seems to have been the course in other cases. See *Copeland* v. *The State*, 7 Hum. In fact, we think the practice has been very general to admit of proof of this character, and leave its effect to be determined by the jury with proper instructions.

We are not to be understood as intimating any opinion upon the facts of this, or to the effect that a jury ought to give to evidence of the character offered in connection with the facts immediately attending the homicide.

The principle of self defense, as laid down by this court in the case of Granger, and subsequent cases modifying that case, while of vital importance, has, no doubt, resulted often in the acquittal of guilty men; but judges are not on this account to take away from the jury the trial of the accused.

We regard the question presented as one of great importance. We do not find in the cases from other States furnished by counsel any satisfactory discussion of this precise question. They discuss other questions of interest bearing upon this more or less directly, but questions generally satisfactorily settled by cases in this State.

We confess the weight of the argument that if the judge can see that proof of previous threats and hostile demonstrations should constitute no defense to the prisoner, why permit the evidence to be heard. And we do not say that cases may not arise, such as the case supposed by the Attorney General, where it appears absolutely impossible that the defendant could have acted under a fear of danger from the deceased at the time, that the court might not properly refuse to allow evidence of previous threats. We leave cases of this character to be decided when they arise.

But such is not this case. It was not impossible that the defendant could have acted under an honest fear of his own life. We express no opinion upon the facts farther than this: The effect the jury should give to the proof of previous threats, etc., would depend upon their opinion as to the entire facts and circumstances. * They should be fully instructed upon the principles applicable, and particularly that previous threats, etc., no matter of what character, would not of themselves justify the defendant in slaying his adversary.

We think the error of the court below consists in this: The judge undertook to decide upon the effect

of the evidence for the State; that in this testimony there was no evidence that would have authorized the judge to find the defendant excusable upon the ground that he acted under a reasonable fear of his own life, no matter what proof of previous threats and hostile acts might have been proved, for it results in this at last. No matter how clear this may have been to the judge, it was a question for the jury. If he could decide this in one case, he could in all cases.

We hold that the proof of previous hostile demonstrations upon the part of the deceased towards the defendant, as well as previous threats, and the character of the deceased, which might illustrate how much importance should be allotted to his threats, were all properly admissable, but the proof offered of particular acts of hostility towards other parties was properly rejected, and for the error of the court on this question we reverse the judgment and award a new trial.