# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
July 24, 2007 Session

## STATE OF TENNESSEE v. JEANIE MARIE SEALS

**Direct Appeal from the Criminal Court for Hamblen County**
**No. 05CR035     James Edward Beckner, Judge**

_____

**No. E2006-01878-CCA-R3-CD** - Filed January 8, 2008

_____

A Hamblen County jury convicted the Defendant of one count of second degree murder, and the trial court sentenced her to twenty years.  On appeal, she contends that: (1) the evidence is insufficient to sustain her conviction; (2) the trial court erred when it admonished her counsel in front of the jury; (3) the trial court denied her constitutional right to present a defense; and (4) the trial court should have ordered a new trial because a juror made false statements during voir dire.  We conclude that, because the Defendant claimed self-defense at trial, the trial court erred when it refused to admit testimony about a prior incident in which the victim threatened the Defendant's life.  Further, we conclude that this error is not harmless beyond a reasonable doubt.  Accordingly, we reverse the judgment of the trial court and remand for a new trial on the charge of second degree murder.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which J.C. MCLIN, J., joined. D. KELLY THOMAS, JR., J., concurred.

Jonathan M. Holcomb, Morristown, Tennessee, for the Appellant Jeanie Marie Seals.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; Rachel West Harmon, Assistant Attorney General; C. Berkeley Bell, District Attorney General; Victor Vaughn, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION
### I.  Facts

This case arises from the killing of the Defendant's boyfriend, Walter P. Davis, which occurred in November of 2004.  The Hamblen County Grand Jury indicted the Defendant for first degree murder.  At her trial, the following evidence was presented: Nakisha Fugate testified that she had been friends with the Defendant for fifteen or sixteen years, and on November 28, 2004, the Defendant came to her house between 8:30 and 9:00 a.m. asking to use the phone to call the police department.  The Defendant called the police and asked for an escort to the Defendant's house to get clothing for her children.  The Defendant told Fugate that the police

informed her they could not escort her because she did not have the correct paperwork. The Defendant asked Fugate to go with her, and Fugate agreed.

Fugate testified that on the way to the Defendant's house the Defendant explained that she and the victim had been in a fight, during which he hit her. He stopped hitting her when the children walked in, she left, and called her cousin and told her cousin to go and get the kids. The Defendant said that she needed to get some clothes for her children, who were staying at her cousin's house. The Defendant asked Fugate to knock on the door and ask the victim for some clothes. The Defendant was hiding in the bushes and appeared scared. No one answered when Fugate knocked, and the Defendant asked her to look into the living room window. Fugate did not see the victim, and both women went to look in the bedroom window. Fugate did not see anything, and the Defendant asked Fugate if that was the victim lying on the floor of the bedroom. Fugate said she saw someone lying there, and she ran into the house. Fugate told the Defendant to wait outside, while she went to see if the victim was okay.

Fugate yelled the victim's name and got no response. She exited the house and told the Defendant to call the police. The Defendant called police from a neighbor's house, and when they returned to her house, the neighbors asked Fugate if the victim was okay or if he was dead. Fugate indicated that she did not know, and she thought the Defendant appeared calm during this time.

On cross-examination, Fugate testified that she did not see any bruises on the Defendant, who was wearing a long-sleeved shirt. Fugate had, however, seen bruises on the Defendant before, which the Defendant told her were caused by the victim hitting her.

Jimmy Peoples, the director of the Morristown Hamblen County 911 Communications Center, testified about two 911 calls that came into his center on November 28, 2004. Those tapes were played for the jury. On cross-examination, Peoples testified that the two calls came into the center from different addresses.

Mike Hayes, a detective with the Hamblen County Sheriff's Office, testified that he investigated the shooting death of Walter P. Davis. When he went inside the house he saw in a hallway the body of a black male, lying almost face down with his legs stretched across into a bedroom. The detective saw what appeared to be a puddle of blood underneath of his head. As he walked farther down the hallway, he saw a white powder and some kind of sheetrock material lying around the body. He noted that the victim appeared to have two wounds, one to the lower jaw and one to the back neck area. There were also two holes in the wall above the body, one smooth, indicating something entered there, and one larger and rough, indicating that something exited there. The detective noticed that there was a bedroom that appeared to belong to a young male child and another bedroom that appeared to be that of a small female child. He saw a bunk bed in the female child's room and a spent shell casing on the floor near the bunk bed. On the bunk bed, the detective found a spent bullet with white powder on it. He saw two holes, one that appeared to go through the wall and one that entered through the comforter and into the box springs of the mattress on the bunk bed.

Inspecting further, Detective Hayes testified he saw a black, open billfold in the bedroom where the victim's body lay. There was no money in the billfold; rather, it contained the victim's personal papers. He saw near the bed a pile of clothes, a pair of blue jeans with a jacket and a tee shirt on top of it. He found another spent shell casing on the side of the bed and another under the jacket. Detective Hayes noticed a reddish-brown stain that appeared to be blood on the upper portion of the bed. He found a small package of white powder underneath the mattress in the bedroom and another plastic bag of white powder next to the baseboard. After testing, both came back positive as cocaine. Detective Hayes obtained a bullet from behind the sheetrock in the walls and another bullet from the bed in the female child's room.

On cross-examination, the detective did not know how many people had been in the house before he arrived, but no one was present in the house when he got there. Detective Hayes testified that while he performed his investigation he needed extra security because several "loud" people who were not "calm" had gathered in the road in front of the house. He again described where he found the two packages of cocaine and said one package weighed 4.1 grams and the other weighed 2.5 grams.

Chad Smith, a special agent with the Tennessee Bureau of Investigation ("TBI"), testified he participated in this investigation by interviewing the Defendant. The Defendant provided a written statement, which was read to the jury:

I live at 655 Wylie Miller Road with my two children and my boyfriend, Walter Davis.

Walter and I have been dating for nine years. We have one child together, Terrell Davis, age six. My daughter, Teleshia Seals is eight years old. Her father is Stanley Jones. He lives in New York, and has no contact with Teleshia.

It had been about two or three years ago since he has seen her. I rent the house. It is in my name. We have lived there for about one year. Walter doesn't work anywhere. He sells crack cocaine and pills sometimes.

Walter owns a black Cadillac, red Sunfire, a two-tone pickup, a 1968 or 1969 Impala, and a boat. These items are paid for and were paid for with cash or traded for dope for. The boat was the only thing he traded some dope for. He got it from Michael Bullington. The others, he paid for with cash and put them in various people's names.

The Impala is in the shop getting painted. It is in Alpha in the B.P. Walter owns half the Outdoorsman, also known as the Ebony Club. He owns it with some other people, I think Isaac Young and Pig. I believe Pig got the license to sell beer, because the others have felonies on them.

Walter buys cocaine from a Hispanic male. I don't know his name. He drives a new green Ford truck and a blue Toyota Tercel with tinted windows.

Walter has been dealing with him since January 2004.

The Hispanic male would bring cocaine to Walter about everyday. He would bring one or two ounces at a time. Walter paid cash for it. Walter said he got it cheap and paid around eight or nine hundred dollars an ounce.

Walter would then make crack, using the cocaine he bought from the Hispanic male. Walter made it in the kitchen. I typically left with the children, because I didn't want them around that.

Water would sell the crack at the Outdoorsman. People very rarely came to the house to buy. They included Angie Graves; a gal named Too Tall; and his brother; Felicia; her daughter Tia is in jail; a guy named Mark who works for the cable company, he is short and dark hair and chunky.

Walter also bought dope from his brother, Joe Davis. He also bought dope for Joe when Joe was out. Joe was wanted and staying in Knoxville with his sister, Jean Cain. The last time I seen the Hispanic male was on Tuesday. Walter went outside to the Hispanic guy's truck. Walter came back inside and made me and the kids leave. Walter typically kept cash and drugs in a hole in the wall behind the door on the enclosed carport.

Walter told me on several occasions that he was strapped, which I took to mean he was armed. I s[aw] Walter with a gun about a year ago. It was at our previous house on Barton Drive. It was a long gun, and he had gotten it out of the closet to sell. I haven't seen any guns at our house on Wylie Miller, however, about two weeks ago, I overheard Walter talking on his cell phone with someone about guns.

The person was obviously . . . wanting a gun. . . . Walter named several off and commented he had nine here at the house. He then commented that he had some at two other spots. After he hung up, I told him that I didn't want any guns around the kids.

Walter's mother, Lorene Foster, keeps money for Walter sometimes at her house in Morristown. I know Walter had thirty-five hundred dollars in his wallet on Thursday. I counted it for him. It is a black leather wallet. Walter would keep the wallet in his pocket, underneath the mattress, or underneath the pillow.

On Thursday, Walter had a telephone conversation with one of his friends. I don't know who it was, but from the tone of the conversation, I assumed it was a friend.

Walter was told that they had been robbed and he, Walter, was next along with Isaac Young. Walter commented that he had a gun and would shoot them if

-4-

they came over. He also told me to wake him up if I heard any noises.

On occasions, when the Hispanic male came over, Walter would ask me to tell him that he was not at home. He would hide in the bedroom because he owed the Hispanic male money.

Walter had another source of cocaine prior to this Hispanic male. It was also a Hispanic male. I don't know his name. His wife's name was Melissa. They did live in Jefferson City. They drove a dark blue, newer truck with rims on it.

I last s[aw] Walter last night around 6:40 p.m. Walter was accusing me of seeing someone else. That is not true. I'm not seeing anyone else. Walter had been feeling bad yesterday. He said his chest was hurting and that he was throwing up blood. Walter was in the bed about all day.

Walter was raising his voice and yelling at me. He sat up in the bed and acted like he was going to get up. I told him that I was leaving. So I took the kids and left. Walter was in our bedroom watching TV. Walter had on his boxers and nothing else.

The bedroom was clean. I d[id] that yesterday morning. The shade toward the back of the house was down, and just opened. The window has curtains. They were tied back and in good shape.

I drove the Sunfire to my cousin's house in Jefferson City. His name is Timothy Risentine (phonetic). He goes by Bucky. He lives on Golden Circle in a trailer park. When I got there, his clock said 7 o'clock p.m. His girlfriend, Jane Ann Hickey, was also there.

Me and the children stayed there all night. Bucky left last night around 10:00 p.m. and hadn't returned when I left this morning. I left their house around 9:00 a.m. or 9:15 a.m.

I drove to Kisha's house in Morristown. She lives on South Cumberland at the Colonies. I used her phone to call dispatch and ask for an officer to go with me to the house so I could pick up some belongings. I was told they wouldn't do that until I had a court order, so I asked Kisha to go with me to the house. I figured if I had someone with me, Walter would not hit me for not coming home last night.

Kisha rode with me to the house. We got there around 9:45 a.m. or 10:00 a.m. Kisha and I went to the side window of the house where my bedroom was . . . . I thought that we would knock on the window and see if Walter was in there. My bed makes noise, and I thought if I heard it, I would know that he was in

-5-

there. If it didn't, I knew that he would have been in the living room on the couch.

We knocked on the side window, and didn't hear anything. We then went around to the back window of my bedroom, and I looked in. I noticed the shade was all the way up, which is very unusual. I glanced inside and didn't see anyone in the bed, but thought I had seen someone l[ying] on the floor.

I asked Kisha to look and see if I was seeing right. She looked and said she did. She took my keys to the house, and went in the front door while I stood out in the yard. She came back outside and told me to call 911. She told me he wasn't breathing. I told her that I couldn't drive. She told me, yes, I could, because she needed to stay there with Walter.

I drove two streets over to Pendleton Avenue to Pam's house. I know her from walking. Pam called 911 for me, because I was upset. She kept asking me – asking me what was wrong, and I told her that I thought Walter was dead. I then drove to the house. Pam rode with me in the Sunfire. Her husband, Gene, drove over, as well, in his truck. We waited until the police arrived. I was just told he wasn't alive. I hadn't been in the house yet.

I believe Walter is seeing someone else. I have heard him talking on the phone a couple of times with someone, using a voice that I feel he is not speaking with a man. Walter's cell phone number is 423-[XXX-XXXX.] It is through Verizon.

When Walter learned from his friend that he was robbed, Walter told me that his friend was tied up along with his girlfriend. He said the guy was pistol whipped and ten thousand dollars was stolen. Walter said the people who d[id] it were wearing masks, and he didn't know if he knew who it was or not.

Walter has beat me up in the past. I have filed reports both in the Hamblen County Sheriff's Department and with the Morristown Police Department. He was arrested for domestic violence.

When I came over this morning, I left my children at my cousin's house. When I left last night, I didn't take any clothes with me. My cousin's girlfriend gave me a change of clothes. I was wearing a blue tee shirt and shorts yesterday when I left. I have them on now, as well as a sweatshirt and sweatpants that Jane Ann Hickey loaned me.

This statement was signed by the Defendant.

Agent Smith asked the Defendant who may have killed the Defendant, and she told him maybe a drug dealer. The agent and other officers also interviewed the victim's neighbors and

Fugate, and he noticed discrepancies between their statements and the Defendant's statement. For instance, Fugate indicated that there had been a physical altercation between the victim and the Defendant while the Defendant said that it had only been a verbal altercation. There was also some discrepancy about who picked up the Defendant's children from her home, and some neighbors reported seeing some cars at the house when the Defendant said that she had already left for the evening.

Agent Smith questioned the Defendant another time about those discrepancies, and she gave a second statement as follows:

So I previously gave S. A. Smith a statement about my boyfriend, Walter Davis. The statement about how I found him laying in the hallway at our house is not correct.

I shot Walter this morning. Yesterday, November 27, 2004, I went to my uncle's house on Guy Collins Road in Morristown. His name is Rusty Southerland. I got there around 11:00 a.m. I stayed there visiting until around 2:30 p.m. Rusty and two of his children were there.

I took my two kids, Telishia and Terrell with me. When we got home around 2:30, Walter was there. He was in bed and said he was sick. Walter fussed at me for being gone so long. He told me that I couldn't use his car anymore.

Walter's mother, Loraine, got to our house around the same time the kids and I arrived home. Her other son, Ryan Foster, was with her. They stayed about ten minutes and visited Terrell. Terrell has a broken arm, which he got at Loraine's house from falling off the couch. It happened around 6:00 p.m. Thanksgiving night, but Walter wouldn't take him to the hospital until midnight.

Walter didn't say anything to them – to me until after his mother and brother left. Rusty came by, and visited around three o'clock. Rusty and I watched the U.T. football game in the living room. Walter and Rusty's son, Daniel, watched TV in our bedroom.

Daniel is 19. He is disabled and has to be carried from place to place. Darrell and Walter appeared to be getting along fine. Walter was smiling and so forth.

After the game went off, Rusty, Daniel and I watched a movie in the living room. We watched Riddick on D.V.D.

Rusty and Daniel left about five o'clock. We didn't get done, because Rusty had to pick up his daughter at a party. It was my movie, but Rusty took it

-7-

with him to finish.

After they left, Walter ignored me. Walter had made the comment about the car between the time his mother and Rusty had c[o]me by. Walter continued to ignore me until seven o'clock. Walter then started telling me what to do, and making smart comments. As he would walk toward the kitchen, he would bump into me and tell me to get the hell out of the way.

At 11:35, Walter spoke with someone on the telephone. Teleshia and I were watching a movie in the living room. Terrell was in our room with Walter. I asked Walter when I could come to bed after he finished his phone call. Walter was laying across the bed, and I didn't have anywhere to lay down.

Walter told me that he was going out. He got up and took a shower. He didn't say bye or where he was going. It was around 1:00 a.m. when he left.

I went to bed in my room. Terrell slept with me and Teleshia slept in her room. If you're standing at the foot of the bed, I slept on the left side, which is closest to the door. Terrell slept in the middle. Walter came home around 5:00 a.m.

As soon as Walter came home, he came into the bedroom and walked to his side of the bed. He snapped his fingers, which I understood to mean Terrell needed to go to his bed. I took Terrell to his room. He was still asleep.

I came back to the bedroom and laid down. Walter went into Terrell's room, where I assumed [h]e kissed him goodnight. When he came back into the bedroom, he got undressed.

He first took out a pistol from his waistband, and placed it underneath his pillow. He then took off his clothes and put them on the floor beside the bed. He then sat down on the bed. He asked me if I was going to give him head or not and if we were going to have sex.

I told him no. Walter then got up and shut the bedroom door. Walter then walked to his side of the bed and sat down. Walter then told me he wanted me to tell him the truth about some things because I had been lying to him for about two weeks.

I told him that I didn't know what he was talking about. Walter said I did and that he didn't have to tell me.

I kept telling Walter that I didn't know. Walter lit a cigarette and told me that I had until he finished his cigarette to tell him or he was going to beat me.

-8-

He got the cigarette from the end table next to the bed. When he finished the cigarette, I hadn't said anything. He walked around to my side of the bed and told me he wanted me to tell him the truth because he wasn't stupid.

I didn't say anything. Walter then punched me with a closed fist in the left temple. I was laying on my right side when he d[id] this. I sat up and asked him not to hit me. He told me to shut up because I was being too loud and would wake the kids.

He said that if I got too loud, he would hit me harder. Walter then punched me with his fists in the top of my head. I tried to get away from him, pushing myself to the other side of the bed. I fell off backwards onto the floor next to the ironing board. I then got underneath the ironing board and held my arms over my head. I was crying and Walter told me to shut up because he didn't want to hear any of that crying baby stuff.

Walter continued punching me in the head. He hit my left arm while punching me. Walter said that he was the baddest [sic] mother fucker in Morristown, and that everyone feared him.

Telishia opened the bedroom door and was crying. Walter yelled at her to get back in to her bed. She walked toward her room, and Walter followed her. As Walter was walking though the bedroom door, he said that he was going to beat the shit out of me for waking her up.

I stood up and grabbed the pistol from underneath Walter's pillow. I pointed it toward the door where Walter was at and shot. I only remember shooting one time. It is possible I shot more than once, but I don't remember it.

It was dark, but Teleshia had a lamp on in her room. I heard Walter fall and hit the floor. I stood there and waited on Walter to get up. He didn't. I was standing at the end of the bed when I shot [the gun], I held it with both hands.

Walter took me out one time when he was shooting and let me shoot it. I went to the bedroom door and yelled for Teleshia. I told her to put her house shoes and come with me. I told Terrell to get his house shoes on and go out the front door. Teleshia and I climbed out the bedroom window. That is how the blind got raised.

Once outside, Teleshia and I met Terrell at the car. I had the gun with me. We going into the car and started towards Bucky's. I turned on Sulphur Springs Road from Highway 160 to throw the gun out, because I didn't want it near my children.

I threw the gun out on Sulphur Springs, past Jack Green's junkyard. I wrapped it up in a purple jacket that was in the car. It was one [of] Teleshia's old ones.

I turned around and went back the way I had c[o]me. I then drove to Bucky's. I got there around 6:30 a.m. I woke Jane Ann up. Bucky wasn't there. I told Jane Ann that Walter and I had been arguing, and that I needed to get away. She let us in and we sat on the couch.

We watched TV. I then went to Kisha's house as I previously stated, around 9:00 a.m. I called dispatch and asked for an officer to go with me to the house. I was afraid that I had only nicked him and that Walter would kill me. The police wouldn't go.

Kisha went with me to the house, and that's when she went into the house and found Walter.

This statement was also signed by the Defendant.

On cross-examination, the agent testified that he asked the Defendant specific questions when she was composing her statement. Agent Smith agreed that he confirmed that someone was robbed and had ten thousand dollars stolen in Morristown as the Defendant had said in her statement.

Freddie Kimbrough, a detective with the Hamblen County Sheriff's Department, testified that he investigated this killing. He arrived at the scene, and later transported the Defendant to the Sheriff's Department where he assisted in her first interview. After the first interview, the detective said they took a break, and then he went into the interview room and told the Defendant things did not feel right to him about her story. She said she wanted to see her kids one more time, and, when he agreed, Agent Smith came back in, and the Defendant gave them her second statement. The detective testified he found a weapon wrapped in a garment on Sulphur Springs Road, as the Defendant had described. The gun was still cocked and ready to be fired. On cross-examination, Detective Kimbrough agreed that the Defendant accurately described where the gun was located and the garment wrapped around the gun. He also agreed that the gun "would fire very easily" in the condition that it was found.

Mike Kitts, a detective with the Hamblen County Sheriff's Department, testified he participated in this investigation. After he arrived at the crime scene he gave, the Defendant signed, a consent to search form for her house. The Defendant signed the form. The detective also interviewed Fugate and transported the evidence to and from the TBI laboratory. On cross-examination, the detective testified that he swore out an affidavit of complaint charging the Defendant with voluntary manslaughter. He also agreed that he went before the grand jury, and the Defendant was indicted for voluntary manslaughter but the indictment was later amended to first degree murder.

Mark Harrell, a physician at the emergency department at Morristown-Hamblen Hospital, testified he saw the Defendant in the emergency room on November 28, 2004. The Defendant complained of a headache and said her boyfriend hit her repeatedly in the head and had twisted her arm. Dr. Harrell thoroughly examined the Defendant, treated her with some pain medication, and released her when her headache improved. The doctor did not see any evidence of serious or life threatening injuries. He did, however, see multiple hematomas, or bruises, to the Defendant's scalp and a bruise to her forearm consistent with finger pressure. On cross-examination, Dr. Harrell testified that, by "multiple," he meant that the Defendant had more than three bruises to her scalp.

The parties stipulated to the admission of testimony by Sergeant Chad Mullins of the Hamblen County Sheriff's Department testimony. They agreed that, if present, Sergeant Mullins would have testified that, on December 5, 2004, at approximately 6:21 p.m., the sergeant was dispatched to the scene of the death by gunshot of Walter P. Davis. There he went to the Defendant's daughter's bedroom where he photographed and collected the spent bullet that came to rest in the mattress.

Wendy Tate testified that she had known the victim for thirteen years and the Defendant for ten or eleven years. She described herself as "good friends" with the Defendant. Tate, who went to the Defendant and victim's house regularly, described the victim as a good father to both his biological child, Terrell, and the Defendant's daughter with another man, Teleshia. Tate did not have any indication that the victim and the Defendant argued, and the victim never spoke badly to her or to her children. During their friendship, Tate recalled that the Defendant had visited the Defendant's mother on multiple occasions in Ohio and stayed for periods of time ranging from between one week to one month. Tate recalled the Defendant saying that the victim found a letter the Defendant wrote to a man, whom she described as a "boyfriend," which led to an altercation between the victim and the Defendant. The Defendant said this Ohio boyfriend was "good to her and to the kids."

Tate said that a year before the victim was killed, the victim obtained custody of Terrell and the Defendant could not leave the state with Terrell without the victim's permission. Two weeks before the murder, the Defendant asked Tate to take her to a house on Liberty Hill Road. Tate waited in the car while the Defendant went into the house. When the Defendant returned after thirty to forty minutes, she told Tate that the woman in the house knew a hit man and that the Defendant was going to do away with the victim. A couple of days later, the Defendant told Tate the woman could not find the hit man, so the Defendant was going to have to "do it herself." The Defendant's plan was to make it look as if there had been a robbery. Tate told the Defendant she should not go forward with her plan because she would get caught, and the Defendant laughed. The Defendant told Tate it would be easier for her to get away with killing the victim because he was a drug dealer, and the police would think the killing was drug related. Further, she said there were records showing he had beaten her. Tate said that she told the victim what the Defendant had told her.

While the Defendant was in jail, Tate wrote her a letter in which she stated that she knew the Defendant did not shoot the victim on purpose because she would never endanger her

-11-

children's lives. Tate testified the substance of this letter was a lie. On cross-examination, Tate said she only told the Defendant this because she did not want the Defendant to think that she betrayed her. Tate conceded she had a ten-year-old conviction for criminal impersonation. Tate said she never told police that the Defendant threatened to hire a hit man to kill the victim and threatened to kill him herself. She explained she did not go to the police because the victim was only her acquaintance, even though she had lived with him and the Defendant for three months. Tate said she had seen evidence that the victim beat the Defendant, but she did not want to get involved. Tate said that she believed that a man named Buddy Treece beat up the Defendant and shot the victim.

Robert McFadden, a forensic scientist for the TBI, testified that the gun and magazine did not have any fingerprints on them. Don Carmen, a Special Agent with the TBI, testified that he works in the crime laboratory at the TBI, and he received the gun, bullets, and shell casings related to this case. He determined that the bullets were fired from the gun and, while not one hundred percent certain that the shell casings were expended from the gun, he found that the shell casings bore a similar marking to the firing pin of the gun. On cross-examination, the agent said this gun was a semi-automatic weapon, and he explained how such a gun worked.

Dr. Cleland Blake testified that he performed the victim's autopsy, during which he noted the victim suffered a gunshot wound to the head, one to the neck, and one to the lower abdomen. He obtained some bullets from the victim's body, which he gave to Detective Kitts. He opined the victim was first shot in the abdomen, the second gunshot was to the left neck, and the third shot was the lethal wound to the head. Further, he said the first two gunshot wounds would have caused the victim to be "down"; therefore, he was "down" when he received the head shot that killed him. On cross-examination, the doctor said he could not be certain whether the victim was actually on the floor or falling to the floor when he was shot the third time. He agreed there was no stippling around these wounds, meaning the shot had to be fired from more than two feet away.

Mike Turbeville, a special agent with the TBI, testified that he works in the serology DNA unit of the crime laboratory. As such, he analyzed the bed sheets found at this crime scene and determined that the blood on the flat and fitted sheets matched the victim. On cross-examination, Agent Turbeville described the bloodstain as "small" and agreed he had no way of determining how or when the blood stain got on the sheet.

The Defendant called Regina Johnson to testify, who worked for the East Tennessee Children's Hospital in Knoxville. Johnson said she met the Defendant in August 1998 when the Defendant's son, Joshua, was diagnosed with Leukemia. Johnson and the Defendant were friends until the Defendant's son died in June 2001. Johnson provided counseling to the Defendant on an estimated 200 occasions. The Defendant brought Joshua's siblings with her to counseling because she had no one to take care of them. Johnson recalled that she observed the Defendant's boyfriend, the victim, at the hospital only twice during this time.

Donna Scarce, the Defendant's neighbor, testified that she saw the Defendant with a black eye on one occasion, and she often saw that the Defendant had bruises on her arms. Scarce

said the Defendant rarely wore shorts, but, when she did, there were bruises on her leg. She recalled one time when the Defendant had a huge bruise on her leg. On cross-examination, Scare testified the Defendant was scared to go home because she was terrified of the victim. The victim admitted to her on one occasion that he had hit the Defendant. Scarce recalled a conversation that she had with the Defendant in which she asked the Defendant why she did not leave the victim, and the Defendant said something to the effect of it would take the victim dying for her to be able to leave.

Tim Brisentine, the Defendant's cousin, testified that Agent Turbeville took his statement, and the agent did not do so accurately at first. Brisentine had to revise the statement repeatedly until it accurately reflected what he said. Brisentine testified he saw the Defendant with "knots and bruises" on her.

Jane Hickey testified she knew the Defendant through the Defendant's cousin, Buckey. She saw the Defendant one morning in November 2004 when the Defendant came to her house. The Defendant asked Hickey if Buckey was home, and, when Hickey said no, the Defendant asked to speak with Hickey. The Defendant told Hickey she shot the victim and asked Hickey to watch her children. Hickey described the Defendant that morning as "tor[n] up . . . walking the floors, and panicking." She said the Defendant was "very, very upset." Hickey testified that in the sixteen years she had known the Defendant before this incident, the Defendant never mentioned wanting to kill the victim. Hickey recounted a time when the Defendant came to live with her for a short period of time because the Defendant and the victim were fighting, and he had beaten her. When the Defendant stayed with her, the victim would come to the house looking for the Defendant, but Hickey did not answer the door. On cross-examination, Hickey testified that it had been several years since the Defendant lived with her.

Sybil Voight, the Defendant's father's neighbor, testified the Defendant came to her house with Teleshia one evening in April 2004. The Defendant had bruises on her face and marks on her neck. Voight told the Defendant to call the police and file a report, which she did. Voight said the Defendant had bruises on her every time she saw the Defendant. She knew the bruises came from the victim hitting the Defendant. Voight said the Defendant stayed with her during April and May 2004. During that time, the victim called her house "constantly," and, when Voight picked up the phone, he threatened the Defendant if the Defendant did not return to their house. He would say "that they were going to find her in a ditch somewhere if she didn't come back home and bring Terrell back home." The victim also came to her house every day and sat in the parking lot. Voight testified that she never heard the Defendant say anything about wanting to kill the victim.

Holly Hodge testified she had been best friends with the Defendant for fifteen or sixteen years. The victim did not like her and did not want the Defendant around her. Hodge tried to make the Defendant leave the victim multiple times, and there were times that Hodge backed away from their friendship because she could not stand to see what the Defendant went through. Hodge testified the Defendant went "through a lot of years of being hit and beaten on." Hodge recalled many times when the Defendant came to her house to hide and had "huge knots in her head, cuts in her head, and bruises." Hodge said, one time, the Defendant was hit in the head

with a plate and required five staples. Hodge recounted another event when the Defendant came to her house and collapsed against her back door. Hodge helped her inside, the Defendant said the victim had beaten her again, and Hodge helped clean the fifteen to twenty wounds to the Defendant's head. Hodge said the Defendant never had any money, drove a "beat-up" car, and did not sell narcotics. Hodge was so scared for the Defendant that she spoke with police on the Defendant's behalf. She was sure the victim would kill the Defendant. Hodge never heard the Defendant mention wanting to kill the victim.

Vickie Arnold, a detective with the Morristown City Police Department, testified she spoke with the Defendant about domestic abuse on more than two occasions. She tried to get the Defendant to go to a shelter or to relocate.

Pam Miller testified she lived near the Defendant and that they were friends. She said the Defendant came to her house on a Sunday morning in November and asked to use the phone to call police. The Defendant said something was wrong with the victim. Miller described the Defendant as "really upset, really nervous, and crying." Miller called 911 while the Defendant was there, and, on the 911 tape, she heard the Defendant crying in the background. Miller recalled the Defendant got so upset at one point she vomited.

Teleshia Seals, the Defendant's daughter, testified about the night of this incident. She said she was watching television in her room when she heard something. She went into her mother's room where she saw the victim beating her mother in the head. The victim then jerked her hand really hard and pulled her into her room. She sat on her bed. She heard the victim say if the Defendant woke up the kids the victim would put the Defendant "in a pile of blood." The Defendant grabbed a gun from under the bed and shot the victim. The Defendant then asked Teleshia to put her shoes on and told her brother to go to the front door. Teleshia and her mother went out the window, and the three went to her Uncle Rusty's house and eventually to her Uncle Buckey's house. The Defendant told Teleshia she saved her by coming into the room.

Wanda Johnson, who lived in a brick house off of Liberty Road, testified the Defendant would come by and visit her on occasion to see how she and her family were doing. The last time Johnson saw the Defendant, the Defendant came to her house and asked to rent Johnson's downstairs apartment. The Defendant said she needed a place to go. The Defendant never asked Johnson about a hit man and she never mentioned wanting to kill the victim.

The Defendant testified she met the victim through a friend while she was living in the "projects." They started dating about a month later, and their relationship was good at first. After a year of dating, the victim became mentally abusive, calling her names. Then, he became physically abusive, hitting her legs, arms, and ribs. At first, the abuse occurred only once every two weeks or once a month. The two dated four or five years before she had their son, Terrell. The Defendant recalled that holidays with the victim were always wonderful, and she loved him very much despite the fact that he abused her. Later in their relationship the abuse got worse, occurring more frequently. It also worsened in severity, and she had to go to the hospital multiple times, once for a broken nose. She said the police had been called on occasion, and she pressed charges several times, but most of the time she dropped the charges because she was

-14-

afraid. The Defendant said that, when other people found out that the victim abused her, he would hit her more and tell her not to say anything.

The Defendant testified she had a son who died from leukemia. He lived three years after being diagnosed, and her relationship with the victim worsened after her son was diagnosed. The victim would stay out more, and he would get mean if she did something that he did not like. The Defendant said she has suffered black eyes, knots on her head, and marks around her throat where the victim choked her. The Defendant recounted one occasion when the victim accused her of stealing from him and hit her in the head with a plate, an injury for which she received five staples. The Defendant said, after the abusive incidents, their relationship would be good "for a while." Then, the victim turned into "mean Walter" again. The Defendant testified she had gone to Ohio and had moved in town to get away from the victim. The victim always "showed up" where she moved. The Defendant had also stayed in motel rooms with her children to try to hide from him.

The Defendant said she was living with a man named George before the trial in this case. She started dating him approximately five months after she made bond on the charges she presently faced. The Defendant dated a man named Shawn Tinelli while the victim was alive, but, at the time, she and the victim were not together. The victim learned she was dating Tinelli because the Defendant wrote him a letter thanking him for being good to her and letting him know she was going to stay with the victim. The victim found this letter, which she thought she had sent or thrown away, and he beat her, blackening her eye and repeatedly hitting her with a notebook in the face. This occurred less than a year before the shooting.

The Defendant said the victim also sexually abused her by making her have sex in ways that hurt her and forcing her to have sex. This occurred about twice per month. The Defendant said, in the year before the shooting, she had to ask the victim if she could leave the house and to drive the car. He took her telephone with her when he left. If she cooked something he did not like, he would pour it out, and she would have to cook again. He complained that the house was dirty, and she had to clean all the time. If she did not clean correctly, he would verbally abuse her and sometimes physically abuse her.

The Defendant said she usually had little money. She drew a disability check, which paid her bills. She would steal money from the victim when her children needed something, because he did not help pay the bills. This occurred once or twice a month.

The Defendant denied telling Tate that she wanted to hire a hit man to kill the victim. She said she and Tate went to Johnson's house, as Tate had described, but she did not ask Johnson to hire a hit man.

The Defendant said, when she and the victim argued, she would go to Ohio to get away from him. He would call her or come and get her. Sometimes when he called her he was "mean," even threatening to go where she was, kill everyone in the house, and then kill himself. Other times, he was nice. When he would come to get her in Ohio, he was very nice. The last time, between four and six months before the shooting, he bought her a dozen roses and an

engagement ring and asked her to marry him. The Defendant returned with the victim because she thought that he wanted to change.

The Defendant described the events the day before the shooting and immediately leading up to the shooting, and her testimony was similar in substance to the second statement she gave to police. The only variance being that she testified that she had reviewed the autopsy and was aware there were four shots fired, three of which went into the victim. She said she recalled firing one shot first that did not hit the victim and two other shots that hit the victim, but she did not recall firing a third or fourth shot. She also testified she learned after this incident that the victim had been drinking, and most of their fights occurred after he had consumed alcohol. The Defendant said she left the house in a tank top and shorts and no shoes, and she climbed out the window. She was still pointing the gun at the victim out of fear he would come after her. She did not believe she had killed him. She said he was "in [her] mind, . . . a very powerful man in a lot of different ways. . . . I had thought that he . . . was invi[nc]ible."

The Defendant said she left and went to Rusty's house. He had an appointment and could not keep her children, so she went to Buckey's house. She kissed her children goodbye and went to Kisha's house. She said, at that time, she still believed the victim was alive, and she wanted someone to go with her so that the victim would not hit her.

The Defendant said she never decided to tell police the victim may have been robbed but that it "just happened." She said she did not tell the truth from the beginning because she was scared she would not see her children again, and she did not know what to do. The Defendant said she did not plan this shooting, and the shooting had nothing to do with her losing custody of her son. She explained the blood on the bed was likely from the victim's nose bleed early on the day of the shooting.

The Defendant said, when the police took her to the hospital after this shooting, she had at least eight knots in her head, a knot on each of her temples, and a bruise on her arm.

On cross-examination, the Defendant agreed she did not always report that the victim hit her when she had to go to the hospital for her injuries and admitted that she lied about how she suffered her injuries. She agreed when she went to the hospital on the day of the shooting, she complained primarily of a headache. She recognized the hospital report indicated that she said she did not have a history of head injuries, but she did not remember reporting that information.

The Defendant denied that she took any money from the victim's wallet and denied that she took items from the wallet out and laid them on the floor to make it look like a robbery had occurred. She said that she did not wipe her fingerprints off of the gun, but she did dispose of the gun on the side of a road. The Defendant said the victim repeatedly beat her but agreed that she could escape the abuse by going to Ohio. She agreed that she repeatedly came back to him. The Defendant denied she took her children to her cousin's house before the murder.

Diana McCoy, a clinical psychologist, testified she evaluated the Defendant. She opined that the Defendant experienced extreme fear for her life while being beaten by the victim on

November 28, 2004. She also opined that the Defendant was involved in a "pretty classically abusive relationship" with the victim. Further, the Defendant suffered from depression, likely as a result of her son's death. Finally, the doctor opined that the Defendant was not insane and was competent to stand trial. On cross-examination, the doctor agreed that her opinions were based upon statements made by the Defendant.

The State called in rebuttal Joanna Whaley, a licensed massage therapist, who testified she knew the victim from when they both worked at Triangle Pacific. The victim quit work in the summer of 2003, and he started working in construction for Buckey Purkey.

The Defendant called Mark Caudell, apparently an investigator for defense counsel, who testified he interviewed Dr. Blake and offered an opinion to the doctor concerning how many shots were fired. Caudell opined that the first shot was to the victim's abdomen, he was then bent over and the second went into his jaw, and, while he was falling, the third shot entered the back of his head. Caudell testified that, after hearing this opinion, Dr. Blake said "I would not argue with that."

At the conclusion of the trial, the jury found the Defendant guilty of the lesser-included offense of second degree murder.

## II. Analysis

On appeal, the Defendant contends: (1) the evidence is insufficient to sustain her conviction; (2) the trial court erred when it admonished her counsel in front of the jury; (3) she was denied her constitutional right to present evidence; and (4) the trial court should have ordered a new trial because a juror made false statements during voir dire. Because we conclude that the Defendant was denied her constitutional right to present evidence, and is therefore entitled to relief, we consider that issue first.

### A. Right to Present a Defense

The Defendant contends that the trial court erred when it refused to allow certain testimony into evidence. First, she contends that the trial court improperly refused to allow Nurse Teresa Hudgens to testify that the Defendant called her one night four years before the shooting and told her that the victim had threatened to kill her. Further, the Defendant sought to introduce a note that Nurse Hudgens wrote to memorialize the call. Second, the Defendant asserts that the trial court erred when it refused to allow Regina Johnson, who worked for the East Tennessee Children's Hospital, to testify that the Defendant did not go to Ohio to see another man but went to escape the victim's abuse. Additionally, the Defendant asserts that the trial court improperly refused to allow her to make an offer of proof about the substance of this testimony. Accordingly, the Defendant asserts that she was precluded from asserting her constitutional rights to present a defense and to due process of law.

First, we note that the Defendant does not contend that the trial court improperly found that the evidence she sought to introduce was inadmissible hearsay. As such, she has waived

-17-

that argument, *see* Tennessee Court of Criminal Appeals Rule 10(b), and we do not address that issue directly in this opinion. Her argument is founded on the fact that, assuming the evidence was excluded in compliance with the rules of evidence, the trial court should have admitted the evidence pursuant to constitutional provisions protecting the Defendant's right to present a defense.

We conclude that the trial court afforded the Defendant an opportunity to present an offer of proof. After the close of the proof and instructions to the jury, the trial court asked the Defendant's counsel if he wished to make an offer of proof. Defendant's counsel chose not to call any witnesses, but instead informed the trial court:

> Your Honor, the testimony which I intended on introducing was from Regina Johnson, as well as Teresa Hudgens. These were nurses who were known to [the Defendant] sometime a couple of years prior to the shooting.
>
> . . . . Why this is so critical to my defense is that [the Defendant] called in the middle of the night one night and said that [the victim] had tried to kill her that night. The nurse, Teresa, Hudgens, wrote down a note that night, and had kept it in her desk drawer just in case something ever . . . happen[ed] to [the Defendant]. . . . The comments from [the Defendant] to the nurse that . . . [the victim] had tried to kill her that night, I agree would be hearsay, although I also say that . . . she has a right to present a defense which trumps hearsay . . . .
>
> . . . .
>
> Well, . . . for a period of four years prior to the shooting and up until the day of today's trial, [Hudgens] still had the same note that she had written for [the Defendant], dated and time written on it, that she had called that night, that [the victim] had threatened to kill her, and even had the indications of notes where she tried to look up places for her to stay.
>
> Further, they raised money for her to get a bus ticket to Ohio the first time and where witnesses – words from [the Defendant], that she came back, because [the victim] had initially just threatened to get custody. I was going to show through the time line after that, that [the victim], in fact, did get custody as soon as she came home. He went ahead and filed anyway.

Defendant's counsel made no offer of proof with respect to Johnson's testimony, and he made no further offer of proof with respect to any other proof from Hudgens. The Defendant asserts in her brief that Johnson would have testified that the Defendant did not travel to Ohio to be with another man; rather, the Defendant went to Ohio to escape the Defendant's abuse.

Pursuant to Rule 103 of the Tennessee Rules of Evidence, "[i]n case [an evidentiary] ruling is one excluding evidence, the substance of the evidence and the specific evidentiary basis supporting admission were made known to the court by offer or were apparent for the context."

Tenn. R. Evid. 103(a)(2). The substance of Johnson's proposed testimony is not apparent from the context and was not made known to the court by an offer of proof. Accordingly, we consider only the evidence contained in this offer of proof; namely, testimony from Hudgens that the Defendant called her in the middle of the night one night four years before the trial and told her that the victim had threatened to kill the Defendant; that Hudgens wrote a note to this effect, which she kept and had with her at trial; that she looked for places for the Defendant to stay; and that she gathered money to pay for the Defendant's bus ticket to Ohio.

Exclusions of evidence may violate the Due Process Clause of the Fourteenth Amendment of the United States Constitution even if the exclusions comply with rules of evidence. *State v. Flood*, 219 S.W.3d 307, 316-17 (Tenn. 2007). Principles of due process require that a defendant in a criminal trial have the right to present a defense and to offer testimony. *See Chambers v. Mississippi*, 410 U.S. 284, 294 (1973); *State v. Brown*, 29 S.W.3d 427, 431 (Tenn. 2000). In *Washington v. Texas*, 388 U.S. 14 (1967), the United States Supreme Court stated:

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

388 U.S. at 19.

The right to offer testimony, however, is not absolute: "In the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence . . . ." *Chambers*, 410 U.S. at 302. Rules of procedure and evidence are designed to assure fairness and reliability in the criminal trial process. *Id.* So long as the rules of procedure and evidence are not applied arbitrarily or disproportionately to defeat the purposes they are designed to serve, these rules do not violate a defendant's right to present a defense. *Flood*, 219 S.W.3d at 317 (citations omitted). Because "state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials," *Scheffer*, 523 U.S. at 308, "[a]n evidentiary ruling ordinarily does not rise to the level of a constitutional violation," *State v. Rice*, 184 S.W.3d 646, 673 (Tenn. 2006). In determining whether an exclusion of evidence rises to the level of a constitutional violation, we are directed to consider the following: (1) Whether the excluded evidence is critical to the defense; (2) Whether the evidence bears sufficient indicia of reliability; and (3) Whether the interest supporting the exclusion of evidence is sufficiently important. *Flood*, 219 S.W.3d at 317 (citations omitted).

Our first inquiry is whether the excluded evidence is critical to the defense. The Defendant contended at trial that she committed this crime while acting in self-defense, i.e., that the victim was attempting to kill her at the time that she shot him. In *Brown*, the defendant was indicted on four counts of sexual abuse of an eleven-year-old family member. 29 S.W.3d at 429.

The trial court excluded hearsay testimony that the victim stated that she had sexual intercourse with an adolescent male during the same time period that the defendant allegedly committed the rape, which the defendant presented to explain the tears in the victim's hymen. *Id.* The Tennessee Supreme Court concluded that the evidence was critical because it rebutted the State's medical proof and offered an alternative explanation for the hymenal injury. *Id*. at 435-36.

In *Chambers*, the trial court limited the defendant in his cross-examination of a witness, McDonald, who confessed to the crime for which the defendant was being tried. 410 U.S. at 295. The defendant was prohibited from cross-examining McDonald because of the common law rule that a party may not impeach his own witness. *Id.* The trial court also excluded as hearsay the testimony of three witnesses, who would have testified that they heard McDonald confess to the crime. *Id.* at 298. The United States Supreme Court held that the excluded evidence was critical to the defense because it implicated constitutional rights "directly affecting the ascertainment of guilt." *Id.* at 302.

In *Flood*, our Supreme Court found testimony that the victim of a sexual assault had asked her father if someone else were caught if the defendant would still have to go to jail. Finding that this evidence was not critical to the defense, the Court stated it could be argued this evidence "tend[ed] to support the prosecution as much [as] they tend[ed] to support the defense." *Flood*, 219 S.W.3d at 317. The Court noted that this evidence tended to show the concerns of an eight-year-old girl for her older cousin, who was the defendant. *Id.* In *Flood*, the Court indicated previous cases on this matter are instructive, but whether excluded evidence is critical to a defense is a fact-specific inquiry. *Id.* Therefore, we must closely examine the facts and circumstances of this case to determine whether the proposed evidence was critical to this Defendant's defense.

In the case under submission, the evidence raised the issue of self-defense. Thus, the trial court was required to charge the jury on self-defense.[1] The self-defense instruction includes an instruction on factors a jury should consider when deciding if there were reasonable grounds for the defendant to fear death or serious bodily injury from the deceased. These factors include, but are not limited to, any previous threats the deceased made known to the defendant; the animosity of the deceased for the defendant, as revealed to the defendant by previous acts and words of the deceased, and the manner in which the parties were armed and their relative strengths and sizes.

The Defendant sought to prove she feared for her life when she shot and killed the victim. Testimony from other witnesses showed the victim had abused the Defendant in the past. Nurse Teresa Hudgens' proposed testimony, however, was the only evidence of the victim's past threats to kill the Defendant. Further, this testimony established that the Defendant believed him enough to call the nurse, seek shelter, and flee the state. The nurse believed the Defendant's story, so she documented the phone call in case the Defendant ever died under suspicious circumstances. We note that this phone call occurred four years before the shooting, but there was ample testimony that the victim continued to abuse the Defendant during this time.

---

[1]We note that the jury instructions were not transcribed as part of the record.

Further, this evidence is evidence of a previous threat by the deceased against the Defendant. We conclude that the testimony of Nurse Hudgens and the note documenting the phone call were critical to the Defendant's defense, and the trial court erred when it excluded this evidence.

Next, we turn to decide whether this evidence bears sufficient indicia of reliability and whether the interest supporting the exclusion of evidence is sufficiently important. We first conclude that the evidence does, in fact, have some indicia of reliability. The Defendant made these statements four years before the shooting to a nurse in confidence under circumstances in which she had no incentive to be dishonest. The nurse wrote down, and dated, the Defendant's statements because she feared for the Defendant's life. The Defendant's statements appear to be reliable and are probative as to whether the Defendant perceived a threat of death or serious bodily injury on the night of the shooting.

Finally, we examine whether the interest supporting exclusion is sufficiently important. The trial court excluded this evidence as hearsay, and the Defendant does not appeal that ruling. Hearsay, is based upon the notion that out-of-court statements lack conventional indicia of reliability: they are usually not made under oath or other circumstances that impress the speaker with the solemnity of the statements; the declarant's word is not subject to cross-examination; and he is not available in order that his demeanor and credibility may be assessed by the jury. *Chambers*, 410 U.S. at 298. The rule excluding hearsay serves an important interest. Under this examination, however, we must consider whether prior threats and acts of hostility by the victim should be admitted in order for a jury to determine whether the accused was acting under a reasonable fear for her own life. *Ellis v. State*, 555 S.W.3d 731, 733 (Tenn. Crim. App. 1977); *see also Jackson v. State* 65 Tenn. 452, 460 (1873). It is error not to do so. *Ellis*, 555 S.W.3d at 733. Accordingly, we conclude that the interest used by the trial court to exclude this evidence is not "sufficiently important." The evidence was highly probative with regard to the Defendant's assertion at trial that she shot the victim in self-defense. As such, the trial court erred when it excluded Nurse Teresa Hudgens's proposed testimony.

Further, we cannot say that this error was harmless beyond a reasonable doubt. The State, in its brief, accurately points out that several witnesses testified that they believed the victim was abusing the Defendant. However, with regard to the issue of self-defense, a critical determination for the jury was whether the Defendant, when she shot and killed the victim, had a reasonable belief that she was in imminent danger of death or serious bodily injury. The exclusion from the jury of the testimony of Teresa Hudgens, a nurse, that the Defendant had previously expressed the belief that she was in danger of being killed by the victim, cannot be easily dismissed as harmless beyond a reasonable doubt. Much of the evidence that was heard by the jury about the victim's abuse of the Defendant came from friends of the Defendant and the Defendant herself. We cannot easily determine that the testimony from an impartial health care professional would not have been afforded substantial weight by the jury. Further, while there was evidence that the victim abused the Defendant, the excluded testimony from Hudgens would have included evidence of a specific threat from the victim to kill the Defendant and that Hudgens and the Defendant feared for the Defendant's life. Evidence of such a prior threat by the victim may well have been crucial to the jury in determining the Defendant's state of mind at the moment of the shooting, which is a critical factor in determining whether the Defendant

-21-

acted in self-defense.

Because we cannot conclude that the error was harmless, we reverse the conviction and remand the case to the trial court for a new trial on the charge of second degree murder. *See State v. Long*, 45 S.W.3d 611, 624 (Tenn. Crim. App. 2001) ("When reversal and remand is based on an error at trial, rather than evidentiary insufficiency, the Double Jeopardy Clause does not bar Defendant's retrial." (citations omitted)).

Although this holding requires reversal, we will discuss the other issues raised by the Defendant so as to not pretermit any duly raised issues. *See Jacobs v. State*, 224 Tenn. 106, 107, 450 S.W.2d 581, 581 (1970) (stating that the Court of Criminal Appeals may not pretermit duly raised issues).

## B. Sufficiency of the Evidence

The Defendant contends that the two witnesses the State relied upon to show "premeditation", Tate and Fugate, were not reliable. When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.w.3d 389, 392-93 (Tenn. Crim. App. 1999). A conviction may be based entirely on circumstantial evidence where the facts are "so clearly interwoven and connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone." *State v. Smith*, 868 S.W.2d 561, 569 (Tenn. 1993). The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citations omitted).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *State v. Grace*, 493 S.W.2d 474, 479 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

This well-settled rule rests on a sound foundation. The trial judge and the jury see

the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1996) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000). Importantly, the credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the evidence are matters entrusted exclusively to the jury as the trier of fact. *Bland*, 958 S.W.2d at 659.

Second degree murder is the knowing killing of another. See T.C.A. § 39-13-210 (2003). "Knowingly" means that a person acts with an awareness that his or her conduct is reasonably certain to case the victim's death. *State v. Page*, 81 S.W.3d 781, 789 (Tenn. 2002) (appendix of suggested jury instruction).

In the case under submission, we first note that the jury rejected that the Defendant acted with premeditation; thus, rejecting in part the testimony of Tate in Fugate. The jury concluded the Defendant acted "knowingly," and the evidence viewed in the light most favorable to the State supports that conclusion. The evidence showed that the victim returned from a night out at 5:00 a.m. When he returned he placed a loaded gun under his pillow. He and the Defendant began to argue, and he hit her multiple times. She grabbed the gun and shot four times. Three of those shots entered the victim, the last of which was fatal. The Defendant left the house through the window and told police the victim must have been robbed. She later told the police she shot the victim because he was, and had been, abusing her. In the face of these facts, a rational jury could conclude that the Defendant acted knowingly so as to support her conviction for second degree murder.

### C. Admonishment of Counsel

The Defendant next contends that the trial court erred when it admonished Defendant's counsel in the presence of the jury, citing to *State v. Jere Seaton and Dwight Seaton*, No. 72, 1986 WL 7849 (Tenn. Crim. App., at Knoxville, July 15, 1986) (finding harmless in the face of overwhelming evidence of guilt the trial court's comments to defense counsel) and *Veal v. State*, 196 Tenn. 443, 268 S.W.2d 345 (1954) (reversing conviction of defendant based on trial court vigorously shaking his head as if in dissent during defense counsel's argument to the jury).

At the Defendant's trial, the State called a witness, Tate, who testified in substance that the Defendant told her she planned to hire a hit man to kill the victim, and, after she could not

find one, the Defendant said she would have to kill the victim herself. Tate wrote a letter to the Defendant while the Defendant was in jail that contained information substantially different from this testimony. On cross-examination, Defendant's Counsel attempted to use this letter as a prior inconsistent statement, and the following occurred:

[Defendant's Counsel]: Would you pass that [letter] to the witness please . . . I want to see if you can identify it.

State: Can we have a copy of that?

[Defendant's Counsel]: If she can identify it, I'll let you see it.

State: Okay.

[Defendant's Counsel]: Do you recognize that letter?

Witness: Can I read it first?

[Defendant's Counsel]: Well, just look at the signatures. I'll show it to the –

State: No.

[Defendant's Counsel]: I'm sorry. Go ahead and read it . . . Do you recognize that?

Witness: Yes.

[Defendant's Counsel]: Your Honor, may I ask if the bailiff can make a copy for the state.

Court: Was that not already an exhibit in the case?

[Defendant's Counsel]: No your Honor. It's cross examination material only.

Court: Not discoverable?

[Defendant's Counsel]: No, your Honor. It goes to impeach her prior testimony. If she admits to the letter, I have no basis for introducing it. It's a prior inconsistent statement.

Court: You were on – If the shoe were on the other foot, you would be in very much trouble. Make copies, and be quick about it, if you would, please. You should have copies and get them first, and you're wasting the Court's time.

[Defendant's Counsel]: I apologize to the Court.

-24-

Court:  Okay.

On appeal, the Defendant contends that because the trial judge is so well respected in the general public the comments made it appear to the jury that defense counsel attempted to do something unethical or illegal.  First, we note that the Defendant made no contemporaneous objection at trial, and she did not move for a mistrial based upon these comments.  The Defendant risked waiving this issue by failing to make a contemporaneous objection to the trial court's statements or by moving for a mistrial.  *See* Tenn. R. App. P. 36(a); *State v. Killebrew*, 760 S.W.2d 228, 235 (Tenn. Crim. App. 1988).  We will, however, review this issue on its merits.

Judges in Tennessee are prohibited by our State constitution from commenting upon the evidence during trial.  Tenn. Const. art. VI, § 9.  In all cases the trial judge must be very careful not to give the jury any impression about his feelings or to make any statement which might reflect upon the weight or credibility of evidence or which might sway the jury."  *State v. Suttles*, 767 S.W.2d 403, 406-07 (Tenn. 1989).  In other words, a trial judge should be very careful not to express any thought that would lead the jury to infer that his or her opinion was in favor of or against the defendant.  *State v. Harris*, 839 S.W.2d 54, 66 (Tenn. 1992).  Further, a trial judge should be judicious in choosing language to admonish counsel in front of the jury, and it is better to admonish counsel, if necessary, outside the presence of the jury.  *See State v. Sutton*, 1896 WL 7849, at *4.

In the case under submission, we conclude that the trial court's statement did not offer an opinion about the Defendant's guilt or innocence.  *See State v. Veal*, 268 S.W.2d at 446-47.  Rather, the trial court admonished counsel for not providing the State with this letter during discovery and for not previously having the letter copied and made an exhibit.  While this comment, if necessary, may have been better made outside the presence of the jury, we do not think, under these circumstances, that it prejudiced the Defendant.  The Defendant is not entitled to relief on this issue.

### D.  Juror Disqualification

The Defendant finally contends that the trial court erred when it did not grant her a new trial because a member of the jury gave a false statement to the trial court during voir dire.  She asserts that juror Cleo Harris had a relationship with the victim.  To prove this relationship, the Defendant presented affidavits from Beth Collins, Labronda Nance, Tange Johnson, and a marriage license showing that Harris's maiden name was "Davis", the same as the victim's last name.

Beth Collins swore that Cleo Harris was "a Davis" and related to Collins on her father's side, making she and Harris second cousins.  Collins did not state how, or if, she was related to the victim.  Labronda Nance swore by affidavit that she knew Harris from the housing projects, where she saw her at the victim's "families' house."  She said that Jon Davis was Cleo Harris's brother and the victim's uncle.  She said that she saw Harris in the "projects" once before the victim died and two or three times after he had died.  Tange Johnson testified by affidavit that she met Harris with the victim, and Harris was the victim's aunt.  Johnson said that Harris was

the victim's uncle's full sister and his mother's half sister. The Defendant also presented a marriage license showing the Harris's maiden name was Davis.

The State offered the testimony of the victim's sister, Susan Davis, who said she is acquainted with Cleo Harris, but she does not know her well. She said that Harris is not her mother's sister, Harris is not related to her family in any way, and she had never seen her at any family reunions. Cleo Harris also testified and swore that she was not related to the victim and that she never recalled seeing him. On cross-examination, she said that there were two sets of Davises in Morristown, and she had no half brothers or sisters. She said that she was not related to a Lorraine Davis and that she had never been to Lorraine Davis's house. She denied knowing Beth Collins, Labronda Nance, or Tange Johnson.

The trial court found that Harris's testimony was credible and that she was not related to the victim in this case.

Article I, section 9 of the Tennessee Constitution guarantees a criminal defendant the right to trial "by an impartial jury." In fact, every accused is guaranteed "a trial by a jury free of . . . disqualification on account of some bias or partiality toward one side or the other of the litigation." *State v. Akins*, 867 S.W.2d 350, 354 (Tenn. Crim. App. 1995) (citing *Tooms v. State*, 197 Tenn. 229, 270 S.W.2d 649, 650 (1954)). In Tennessee, challenges to juror qualifications generally fall into two categories – propter defectum, "on account of defect," or propter affectum "for or on account of some affection or prejudice." *Carruthers v. State*, 14 S.W.3d 85, 94 (Tenn. Crim. App. 2003); *Akins*, 867 S.W.2d at 355. General disqualifications such as alienage, family relationship, or statutory mandate are classified as propter defectum and must be challenged before the return of a jury verdict. *Akins*, 867 S.W.2d at 355. An objection based upon bias, prejudice, or partiality is classified as propter affectum and may be made after the jury verdict is returned. *Id.* "Where a juror is not legally disqualified or there is no inherent prejudice, the burden is on the defendant to show that a juror is in some way biased or prejudiced." *State v. Caughron*, 855 S.W.2d 526, 539 (Tenn. 1993) (citing *Bowman v. State*, 598 S.W.2d 809, 812 (Tenn. Crim. App. 1980). The defendant bears the burden of proving a prima facie case of bias or partiality. *Id.* (citing *Taylor*, 669 S.W.2d at 700).

In the case under submission, we conclude the Defendant is not entitled to relief. Her complaint about Juror Harris falls into the category of "general disqualifications" or propter defectum in that she complains about Juror Harris's family relationship to the victim. These challenges must be made before the return of a jury verdict. *See Akins*, 867 S.W.2d at 355. Further, the Defendant did not prove that Harris was, in fact, related to the victim or that she was in any way biased or impartial. Accordingly, the Defendant is not entitled to relief on this issue.

### III. Conclusion

Based on the foregoing reasoning and authority, we reverse the Defendant's conviction and remand the case for a new trial on the charge of second degree murder.

_____
ROBERT W. WEDEMEYER, JUDGE